**Adolph SAENZ, Plaintiff–Appellant,**

v.

**PLAYBOY ENTERPRISES, INC. and Roger Morris, Defendants–Appellees.**

**No. 87–1247.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1987.

Decided Feb. 26, 1988.

---

Keith G. Fabrizi and R. Clayton Trotter, Trotter, Trotter & Fabrizi, Houston, Tex., for plaintiff-appellant.

R. Dickey Hamilton, Miller, Shakman, Nathan & Hamilton, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, FLAUM, and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

This is an appeal from an extensive district court opinion dismissing the plaintiff's defamation action on a motion for summary judgment.

## I. FACTS

### A. *The "OPS"*

Appellant, Adolph Saenz, alleges that a March, 1981 article appearing in *Playboy Magazine*, entitled "Thirty–Six Hours at Santa Fe," falsely accuses him of complicity in the torture of political dissidents while serving as an official of the United States Office of Public Safety ("OPS") in Uruguay and Panama during the sixties and seventies. OPS was an adjunct of the State Department established after World War II for the express purpose of helping underdeveloped countries establish criminal justice procedures grounded on democratic principles. In 1975, Congress terminated OPS's funding amid the widespread belief that the agency and its International Police Academy condoned, and perhaps even instructed, the torture of foreign citizenry. Saenz headed OPS operations in Montevideo, Uruguay from 1965 until 1969, and in Panama from 1970 to 1973.

On January 31, 1980, seven years after leaving OPS, Saenz became Secretary of New Mexico's Department of Corrections. Two days later, thirty-three inmates were killed in a riot at the New Mexico State Penitentiary at Santa Fe.

### B. *The Santa Fe Reporter Articles*

In a six-article series appearing in the *Santa Fe Reporter* entitled "The Career of Adolph Saenz," defendant Roger Morris, a free-lance writer living in Santa Fe, New Mexico, assailed Saenz's appointment as Secretary of Corrections. Morris was a short-lived employee of the National Security Counsel during Henry Kissinger's tenure as National Security Advisor. He resigned from the Council Staff after less than a year's service in protest of the American bombing of Cambodia and has since become a vocal critic of American foreign policy. The *Reporter* articles were a precursor to Morris's book on the prison riot entitled "The Devil's Butcher Shop." The *Playboy* article followed the *Reporter* series and preceded the release of Morris's book.[1]

### C. *The Playboy Article*

"Thirty–Six Hours at Santa Fe" chronicles, in brutal detail, the bloody riot at New Mexico State Penitentiary in 1980 which left thirty-three prisoners dead and mutilated. Throughout passages describing the carnage, Morris condemns and criticizes what he views as the bigoted social hierarchy of New Mexican society and the nepotism-ridden, corrupt prison system that he alleges contributed to the riot.

Morris also describes disparagingly the penal record of New Mexico's Governor, Bruce King, and his long-time Deputy Secretary of Corrections, Felix Rodriguez. The article contends that King was prepared to elevate Rodriguez to the state's highest penal office, Secretary of Corrections, but chose not to for fear that such a

---

1. Concomitant with these federal court proceedings, Saenz pursued a defamation claim in New Mexico state court based on the *Reporter* articles. Subsequent to oral arguments in this case, the New Mexico Appellate Court released its opinion, *Saenz v. Morris, McCord, & the Santa* Fe Reporter, Inc., 106 N.M. 530, 746 P.2d 159 (Ct.App.1987), affirming a dismissal of that claim. The New Mexico Supreme Court subsequently denied Saenz's petition for a writ of certiorari.

selection would provoke an investigation of the state's prison system. King instead appointed the appellant, Adolph B. Saenz, just two days before the riot.

The *Playboy* article occupies sixteen pages of the magazine, including approximately twelve paragraphs in which Morris details Saenz's career with OPS. Saenz claims that he was defamed by the following passages:

Summoned to the riot-torn pen that weekend, Saenz was later swiftly confirmed by the New Mexico senate to preside over rebuilding the state's shattered facility and reputation.

What no one in the Statehouse knew, or acknowledged, was that the vaunted new corrections secretary had spent 17 years in the U.S. Office of Public Safety (OPS), a CIA-inspired program established in the late Fifties to advise foreign police in suppressing political dissent in Latin America and elsewhere—and then abolished by bipartisan Congressional action 20 years later amid well-documented charges of U.S. complicity in torture and political terror.

... While the murder [of OPS official Daniel Mitrione] aroused antiterrorist sentiments, it also stirred a mounting controversy over U.S.-supported repression in Latin America. Scores of Latin journalists, clergy and others told of grisly police torture of political prisoners in Uruguay, Brazil and elsewhere. Stripped, beaten, sexually abused, tortured under water and on racks, burned with electric needles under fingernails, shocked with electrical wires on the breasts of women and the testes of men, the victims described their agonies in accounts that repeatedly implicated the OPS. U.S. advisers were said to have supplied the torture devices, instructed their Latin police clients in the latest techniques, in some cases even been present at or participated in the sessions.

Mitrione, Washington's official martyr, became a prominent figure in much of the emerging scandal. But in the accumulating evidence about police torture in Uruguay, there were also numerous reports of atrocity for some time prior to Mitrione's arrival in Montevideo in the late summer of 1969. The evidence poured in not only from political dissidents and victims but from a multi-party inquiry by the Uruguayan senate, from the Nobel Prize-winning Amnesty International, from a former Uruguayan police commissioner who resigned in revulsion, from another police official who was tortured himself as a suspected Tupamaro spy, from Catholic priests and then from the U.S. Catholic Conference of Bishops. Torture in Uruguay, said the array of authorities, had been "common," "normal," "habitual" before 1969. And the U.S. adviser who had been Mitrione's predecessor for four years, whose office was on the first floor of the Montevideo *jefatura*, where torture reportedly took place and the screams of the victims reverberated, who by his own account had intimate and influential relations with the Uruguayan police, was Adolph Saenz.

From Montevideo, allegations of torture by his police clients would follow Saenz through subsequent assignments in Colombia and Panama. By the time he left Panama to return to teach at the International Police Academy in mid-1974, the OPS was under rising condemnation in the U.S. Congress and press. When U.S. advisors were exposed in the scandal of the infamous "tiger cage" underground torture cells in South Vietnam, when then-Senator James Abourezk revealed the existence of a torture "school" in Texas for foreign police, when columnist Jack Anderson and other researchers could find theses, films and other documents at the International Police Academy dealing with torture, Congress moved in bipartisan action to abolish the OPS—the only agency so eliminated in the postwar period. Without opposition from a Ford Administration fearing a full investigation, the OPS was disbanded by 1975.

Saenz alleges that the plain and obvious import of these statements, as understood by an ordinary reader, is that Adolph Saenz personally advised foreign police in sup-

pressing political dissent and was an accomplice to torture and political terror.

## D. The District Court's Opinion

Following the transfer of his claim from the United States District Court for the Southern District of Texas to the Northern District of Illinois, Judge Moran held that Saenz was a "public figure" under the rule of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and that, under applicable New Mexico law, Saenz failed to state a claim for libel *per se* but met the pleading requirements for libel *per quod*. Nevertheless, Judge Moran granted summary judgment for the defendants after concluding that the passages complained of were, as a matter of law, not "of and concerning" Saenz, were protected expressions of opinion and not fact, and were not published with actual malice.

## II. DISCUSSION

### A. New Mexico Law Generally

 Under New Mexico law, allegedly defamatory publications may be actionable either as libel *per se* or libel *per quod*. *Saenz v. Morris, McCord & The Santa Fe Reporter, Inc.*, 106 N.M. 530, 746 P.2d 159, (Ct.App.1987) (citing P. Higdon, *Defamation in New Mexico*, 14 N.M.L.Rev. 321, 326 (1984)). Those statements actionable as libel *per se* must, standing alone, tend to render the plaintiff contemptible or ridiculous in public estimation, expose the plaintiff to public hatred, contempt, or disgrace, and must not be susceptible of anything less than a defamatory meaning. *Bookout v. Griffin*, 97 N.M. 336, 639 P.2d 1190 (1982); *Monnin v. Wood*, 86 N.M. 460, 525 P.2d 387 (Ct.App.1974). Communications that are not explicitly defamatory may nevertheless be actionable as libel *per quod* if susceptible of a defamatory meaning when considered in connection with innuendo or explanatory circumstances. *Marchiondo v. New Mexico State Tribune Co. (Marchiondo I)*, 98 N.M. 282, 648 P.2d 321 (Ct.App.1981), *overruled in part on other grounds by Marchiondo v. Brown*

*(Marchiondo II)*, 98 N.M. 394, 649 P.2d 462 (1982).

As the district court explained, New Mexico law permits two alternative theories of libel *per quod*. The first is one in which "extrinsic facts" generally known to readers fleshes out the defamatory meaning of apparently innocent statements. *See, e.g., Morrison v. Ritchie & Co.*, [1901–02] Sess.Cas. 645 (Scot. 2d Div.), 39 Scot.L. Reptr. 432 (1902) (congratulatory birth announcement coupled with the extrinsic fact that the child's parents had been married for only a month). The second is a statement that is "susceptible of two reasonable interpretations, one which is defamatory and another which is innocent...." *Marchiondo I*, 98 N.M. at 288, 648 P.2d at 327 (1981). Saenz pursues this latter theory of libel *per quod*. He maintains that a reader could reasonably interpret the *Playboy* article as accusing him of being an accessory to or a participant in the torture of political prisoners while serving with OPS.

### B. Innuendo

Under New Mexico law, whether a statement is susceptible of a defamatory meaning is initially a question of law. *Marchiondo I*, 98 N.M. at 288, 648 P.2d at 327 (1981). Once that threshold requirement is met, a factual question arises as to "which of the possible meanings the statement actually had." *Id.; Reed v. Melnick*, 81 N.M. 608, 471 P.2d 178 (1970), *overruled in part on other grounds by Marchiondo v. Brown*, 98 N.M. 394, 649 P.2d 462 (1982). Judge Moran determined, as a matter of law, that the constitutional protections shielding statements critical of government prohibited a defamatory reading of the *Playboy* article.

The district court rebuffed Saenz's attempt to extract accusations against him personally from passages that included charges against the performance of OPS. While candidly acknowledging the novelty of its approach, the district court drew upon both *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), in

holding that, before a public official may establish personal defamation premised upon statements that also are critical of government, he must show, with convincing clarity, " 'an explicit charge' 'specifically directed at him.' " *Saenz*, 653 F.Supp. 552, 560. Hence, Saenz's claim that the article implied his complicity in torture without explicitly saying so was insufficient, in the district court's judgment, to overcome the protection afforded free speech critical of government. Indeed, the district court held that a public official may never establish defamation by innuendo where such inferences must be drawn from allegedly defamatory statements which also render a critical assessment of governmental conduct. *Id.* at 562.

■ We, however, believe the district court read too much into *New York Times* and *Rosenblatt.* Although recognizing that freedom to criticize the conduct of government lies "at the very center of the constitutionally protected area of free expression," the *New York Times* Court also noted that "[l]ike insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, ... libel can claim no talismatic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment." *Id.*, 376 U.S. at 269, 84 S.Ct. at 720. In *New York Times*, the Court held that a Montgomery, Alabama City Commissioner could not maintain an action for libel without a showing that the publishing defendants acted with "actual malice". The Court resolved that such an obstacle was necessary to promote the free and valued exchange of political debate and avoid the "self-censorship" attendant "a rule compelling the critic of official conduct to guarantee the truth of all of his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount...." *New York Times*, 376 U.S. at 279, 84 S.Ct. at 726.

The district court, however, would erect yet another barrier to the maintenance of a libel suit by a public official. A requirement that allegedly defamatory statements specifically and explicitly libel the plaintiff

denies a public official the opportunity to demonstrate defamatory inferences that are as clear and perhaps more damaging because of their unlimited nature than even explicitly defamatory charges. Indeed, a public official soiled by the stain of defamatory innuendo is disadvantaged greatly in responding to the varying inferences that may be gleaned from inexact accusations. Such a rule goes too far; it invokes the spectre of heinous abuse by crafty and mischievous authors whose subtle art of insinuation is honed for destruction.

Moreover, neither *New York Times* nor *Rosenblatt* justifies denying a public official a cause of action premised on defamatory innuendo. In addition to rejecting the plaintiff's defamation action for failing to establish "actual malice", the *New York Times* Court disposed of the plaintiffs claim because he failed to demonstrate that the allegedly defamatory statements were made "of and concerning" him. There, the plaintiff official maintained that allegedly defamatory criticism of the Montgomery, Alabama Police Department, of which he was the Commissioner, necessarily libeled him personally because "he was in overall charge of the Police Department and thus bore official responsibility for police conduct...." *Id.* at 289, 84 S.Ct. at 731. The Court found such a proposition "disquieting" because it effectively allowed prosecutions of libel on government, thereby exposing good-faith government critics to sanction contrary to the "very center of the constitutionally protected area of free expression"—political speech. *Id.* at 292, 84 S.Ct. at 732. The allegedly defamatory advertisement in *New York Times* did not make reference to the plaintiff either by name or official position. As the Court noted, "[a]lthough the statements may be taken as referring to the police, they did not on their face make even an oblique reference to respondent as an individual." *Id.* at 289, 84 S.Ct. at 731.

In rejecting Sullivan's attempt to draw personally defamatory inferences from the *New York Times* advertisement, the Court discounted the testimony of seven different witnesses claiming to have gleaned such implications from the publication because

[n]one of [the witnesses] suggested any basis for the belief that respondent himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department [a fact not even mentioned in the publication], and thus bore official responsibility for police conduct; to the extent that some of the witnesses thought respondent to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been....

*New York Times,* 376 U.S. at 289, 84 S.Ct. at 731.

Hence, the Court foreclosed the possibility that impersonal criticism of a governmental entity, without more, may be read as casting defamatory aspersions upon those who serve that agency. *See also Provisional Government of the Republic of New Afrika v. American Broadcasting Cos., Inc.,* 609 F.Supp. 104, 108 (D.D.C. 1985) ("statements which refer to an organization do not implicate its members"); *Church of Scientology of California v. Flynn,* 578 F.Supp. 266, 269 (D.Mass.1984). The Court did not, however, forbid a public official from demonstrating that the text of an article libeled him directly and not merely by association with the governmental agency subject to criticism. Unlike the district court, we believe that identification of the complaining official in the allegedly defamatory material, either by name or position, is an important factor recognized by the Court in *New York Times.* Without such a reference it is extremely difficult or even impossible to infer the plaintiff's direct involvement in the alleged misconduct.

In the present case, some basis, perhaps even a reasonable one, exists for Saenz's claim that the *Playboy* article implied his personal involvement in political torture while an official with OPS. One passage of the article reads:

Torture in Uruguay, said the array of authorities, had been "common," "normal," "habitual" before 1969. And the U.S. adviser who had been Mitrione's predecessor for four years, whose office was on the first floor of the Montevideo *jefatura,* where torture reportedly took place and the screams of victims reverberated, who by his own account had intimate and influential relations with the Uruguayan police, was Adolph Saenz.

From Montevideo, allegations of torture by his police clients would follow Saenz through subsequent assignments in Colombia and Panama....

Whether this implies no more than that Saenz was in a position to know about torture conducted in the countries where he served, as the district court concluded, or whether it impliedly charges Saenz with complicity in that torture is, we believe, a question for the jury under New Mexico law, either resolution of which is constitutionally permissible.

Nothing in *Rosenblatt* detracts from that conclusion. Like *New York Times, Rosenblatt* involved an article that never identified the plaintiff but criticized the governmental agency for which he worked. The plaintiff was employed by the Belknap, New Hampshire County Commissioners, three elected officials responsible for operating a county-owned recreation area that included a public ski facility. Amid controversy over the management of the recreation area, the New Hampshire Legislature transferred control of the facility to a special five-man commission in 1959. The defendant, an outspoken proponent of the change in management, submitted an editorial to the *Laconia Evening Citizen* praising the success of the new management in increasing revenue produced by the facility and asking "what happened to all the money last year? and every other year?" *Id.* 383 U.S. at 78, 86 S.Ct. at 672.

The Court rejected a New Hampshire jury instruction that permitted recovery for defamation where the publication "cast[s] suspicion indiscriminately on the small number of persons who composed the former management group, whether or not it

[was] found that the imputation of misconduct was specifically made of and concerning [the plaintiff]." *Rosenblatt,* 383 U.S. at 79–80, 86 S.Ct. at 673.[2] The Court concluded that such an instruction was contrary to *New York Times* because it "permitted the jury to find liability merely on the basis of [the plaintiff's] relationship to the government agency, the operations of which were the subject of discussion." *Id.* at 82, 86 S.Ct. at 674. Hence, the Court reaffirmed its holding that an otherwise impersonal attack on governmental operations cannot establish defamation of the administering officials notwithstanding their relatively limited number and therefore readily identifiable nature.

The district court, however, incorrectly concluded that "*Rosenblatt* ... held that a public official attempting to transform criticism of government into defamation must be able to show 'an explicit charge.' 338 U.S. at 81, 86 S.Ct. at 673." *Saenz,* 653 F.Supp. at 561. The only mention of an "explicit charge" on the page cited by the district court is dictum indicating that "[w]ere the statements at issue in this case an *explicit charge* that the Commissioner and Baer or the entire area management were corrupt, we assume without deciding that any member of the identified group might recover." *Id.* at 81, 86 S.Ct. at 673 (emphasis added). Taken in its proper context, the Court's language simply does not support the imposition of an "explicit charge" requirement.

Moreover, although the *Rosenblatt* Court did not address directly an explicit charge requirement, it clearly contemplated a defamation action premised on something less than an "explicit charge" specifically leveled against the complaining official. The Court rejected the New Hampshire instruction because it allowed the jury to "infer both defamatory context and reference" from a statement that was no more than an "impersonal discussion of government activity." It acknowledged, however, that "[e]ven if a charge and reference were merely implicit, as is alleged here, but plaintiff could show by extrinsic proofs that the statements referred to him, it would be no defense to a suit by one member of an identifiable group engaged in governmental activity that another was attacked." *Rosenblatt,* 383 U.S. at 81–82, 86 S.Ct. at 673–74. Thus, the Court recognized that a public official could make out a claim where the allegedly defamatory charges were merely implicit, provided the official demonstrates that the accusations were made of and concerning him. Saenz is identified explicitly throughout the passages that allegedly defame him. The question, then, is whether he may draw defamatory inferences from a publication that does not libel him explicitly. *Rosenblatt* suggests that he may.

Although the Court in *Rosenblatt* indicated that "[t]here must be evidence showing that the attack was read as specifically directed at the plaintiff," *id.* at 81, 86 S.Ct. at 673, this merely restates the rule that an official may not transmute criticism of the governmental agency for which he works into personal defamation by that simple fact of association alone. There still may be a showing, however, of defamatory accusation directed against a public official individually (*i.e.,* independent from charges against the government alone) either explicitly or by reasonable implication. Nothing in *New York Times* or *Rosenblatt* restricts the use of innuendo beyond the simple holdings of those cases, oft-repeated throughout this opinion. Nor can this court discern any trend toward eliminating the availability of innuendo to public officials in more recent case law.

■ We are extremely mindful of the importance and value the people and laws of this country place on a free and independent press, particularly when engaged in political debate, *see FCC v. League of Women Voters of California,* 468 U.S. 364, 382, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278 (1984); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 102 S.Ct. 3409,

---

**2.** "The trial judge explicitly instructed the jury that 'an imputation of impropriety or a crime to one or some of a small group that casts suspi- cion upon all is actionable.'" *Rosenblatt,* 383 U.S. at 80, 86 S.Ct. at 673.

3424, 73 L.Ed.2d 1215 (1982), and by no means sanction what in effect may be considered a cause of action for libel upon government. Like the district court, we believe that an official should not be allowed to transform governmental criticism into personal defamation where none exists. We also do not believe, however, that a publisher may, without impediment of law, trammel a public official by "surreptitious and insidious implication" under the pretense of governmental critique. To deny a public official the opportunity to demonstrate the defamatory innuendo of a publication, even one critical of governmental conduct, is to open Pandora's Box from which countless evils may spring. A legal fiction denying the existence of clearly discernable, though not explicit charges, exposes public officials to baseless accusations and public mistrust while promoting an undisciplined brand of journalism both unproductive to society and, as we see it, unprotected by constitutional considerations.

## C. *Actual Malice*

■ Our reading of *New York Times* and *Rosenblatt* is tempered by the continuous effort to balance the necessity for free and unfettered political speech against the right of the individual to be secure in good name and reputation. Thus, in *New York Times*, the Court declined to make the good-faith critic of government the guarantor of all his factual assertions and imposed the now well-known impediment "prohibit[ing] a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279, 84 S.Ct. at 726. Plaintiff, as a public official, cannot succeed merely by proving any defamatory statements false. Saenz must either show that the defendants published the statements with actual knowledge of their falsity or acted with a "high degree of awareness of ... probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d

262 (1968); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974).

Proof of actual malice depends upon the defendant's actual state of mind. *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). Thus, the plaintiff must proffer "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [its] publication," and not merely that a reasonably prudent person would have harbored such uncertainty. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. Furthermore, actual malice must be shown with "convincing clarity". *New York Times*, 376 U.S. at 285–86, 84 S.Ct. at 729; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2508, 91 L.Ed. 2d 202 (1986); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 485 (7th Cir.1986). Saenz concedes that he is a public official for purposes of the *New York Times* rule. He contends, however, that he submitted sufficient evidence of the defendants' actual malice to withstand a motion for summary judgment.

*Anderson v. Liberty Lobby* makes the *New York Times* burden of proving actual malice with "convincing clarity" applicable at the summary judgment stage. Thus,

[w]here the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

106 S.Ct. 2505, 2514 (1986). In reviewing this summary judgment determination, we must examine the record independently, construing the facts and inferences drawn therefrom in the light most favorable to the nonmoving party. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985); *Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir.1976). Although the issue of actual malice need not be resolved conclusively in

favor of the party asserting its existence, the plaintiff must produce "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Brown University v. Kirsch*, 757 F.2d 124, 129 (7th Cir.1985). We agree with the district court that Saenz fails to surmount this obstacle and present a triable issue regarding the defendants' actual malice.

Although we have rejected Judge Moran's narrow construction of the *Playboy* article, leaving such determinations instead to a jury, we conclude that a reasonable jury could not conclude that the defendants either intended or were reckless with regard to the potential falsity of defamatory inferences which might be drawn from the article. What we said in *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480 (7th Cir.1986) is equally applicable here:

> Simply because a statement reasonably can be read to contain a defamatory inference does not mean, as in the case here, that this inference is the only reasonable one that can be drawn from the article. Nor does it mean that the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that the readers could reasonably interpret the statements to contain the defamatory implication....
>
> ....
>
> ... [R]equiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern.

*Id.* at 487.

■ If a plaintiff official must establish by clear and convincing evidence that the defendants acted with actual knowledge of or in reckless disregard for the falsity of their accusations, it follows that where the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material. Saenz fails to make such a showing primarily because, rather than demonstrating that Morris or *Playboy* intended to label him a torturer, the bulk of his evidence merely indicates that the defendants could not reasonably have concluded that he was a torturer. Indeed, as the defendants contend, "[m]ost of the 'evidence' to which Saenz refers simply confirms the fact that neither *Playboy* nor Morris believed that the article accused Saenz of torture."

■ For example, as evidence of Morris's actual malice, Saenz quotes deposition testimony in which Morris admits that he "[had] no evidence that Mr. Saenz was involved personally in the torture in Uruguay.... Okay I have no documents that show Mr. Saenz's participation in, if that's the meaning of the word 'involved' in here, or conduct torture." Saenz contends that because the defendants admittedly lacked evidence of his participation in torture "they *knew* their statements, either directly or in their implications and innuendo, were false." This argument, however, assumes its conclusion. As in *Woods*, the plaintiff fails to supply a missing link necessary to show that the defendants' acted with actual malice. Not only must the plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply or were reckless toward the implications.[3] Evidence of defamatory meaning and recklessness regarding potential falsity does not alone establish the defendant's intent. *Woods*, 791 F.2d at 487. At most, the plaintiff's proof shows that the article is

---

**3.** There are two competing readings of the allegedly libelous statements. The first, advanced by Saenz, is that he has been accused of being a torturer. The second, Morris's position, is that Saenz either knew or should have known about the torture and did nothing to stop it. That latter reading is, of course, an inference or an opinion and is protected.

capable of supporting false and defamatory implications of which Morris and *Playboy,* according to their uncontradicted affidavits, were unaware.

Similarly, Saenz also cites a half-page letter written by Jay Peterzell, an employee of the Center for National Security, to Morris. Peterzell's letter states that he specifically investigated a possible link between Saenz and the teaching of torture, but admitted that "[o]bviously some of this [attached documentation] is still in the form of leads but hopefully ones that lead somewhere rather than nowhere." Saenz contends that the letter demonstrates a recognized failure of proof regarding his involvement in torture. While this may well be true, again, it misses the point. That the defendants lacked evidence of Saenz's complicity in torture does not demonstrate an intent or awareness that the article implicitly accuses him of such conduct. If anything, the lack of such evidence tends to support the defendants' contention that they did not intend or believe that the article so accused Saenz.

■ Moreover, contrary to Saenz's assertions, the omission of his vehement denials protesting any involvement in torture or the alleged "spiking" of source material tending to discount his personal involvement does not indicate that the defendants intended to distort or recklessly disregard the truth. Such omissions are entirely consistent with the defendants' contention that they never intended to or knowingly implied his complicity in torture.

Saenz does produce a letter written by Morris to his literary agent which he claims demonstrates Morris's intent to accuse him of torture. In outlining his proposal for an article on the New Mexico state prison riots, Morris described Saenz in his letter as a "State of Seige character, with his career in Latin torture chambers...." Although it might not be unreasonable to believe that this rather ambiguous statement demonstrates a belief that Saenz was a torturer, it alone could hardly constitute clear and convincing evidence that the defendants knew or intended the defamatory inferences that might now be drawn from

their publication. *See Liberty Lobby, Inc.,* 106 S.Ct. at 2514 (Although the "movant has the burden of showing that there is no genuine issue of fact, ... the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."). At best, the statement is indirect evidence from which no more than a mere suggestion of culpability may be drawn. The letter does not state that Saenz was himself involved in torture. Nor was the statement written contemporaneously with the article or included in the text of the publication itself. Though relevant to the issue of malice, when considered in light of the clear and convincing evidence Saenz must ultimately produce, this one letter, standing alone, is insufficient to require a jury to resolve the plaintiff's claimed factual dispute. *See Liberty Lobby,* 106 S.Ct. at 1505. Charged as we believe we are with considering "the 'quantum' of proof required and ... whether the evidence is of sufficient 'caliber or quality' to meet that 'quantum'," *Liberty Lobby,* 106 S.Ct. at 2519 (J. Brennan dissenting) (citing *Liberty Lobby* at 2513), we conclude that a reasonable jury could not find that Saenz established actual malice by clear and convincing evidence. *Id.* at 2512. ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.").

■ Finally, with regard to Saenz's accusations that *Playboy* inadequately checked the facts of Morris's article, we concur with the district court's holding that

> for purposes of constitutional malice, Playboy's editors were under no obligation to check Morris' facts at all, unless something blatant put them on notice that he was reckless about the truth. *St. Amant,* 390 U.S. at 731–32, 88 S.Ct. at 1325; *Woods,* 791 F.2d at 485. Serious factual improbabilities or inconsistencies in the article itself, or resting it solely on an inherently unreliable source such as an anonymous telephone call, would be sufficiently blatant. *Id.* However, knowledge of an author's ill will toward his subject does not constitute such notice. *Hotchner,* 551 F.2d at 914.

Similarly, absent strong indicators of falsity or unreliability, reliance on a single source does not amount to malice. *Woods*, 791 F.2d at 488.

We also agree that neither Morris nor *Playboy* demonstrated the caliber of journalistic integrity worthy of praise. That alone, however, does not elevate Saenz's claim above the constitutional impediments designed to safeguard the free, vigorous, and hardy exchange of political information. Even in the face of inevitable abuse, "[s]ome degree of [which] is inseparable from the proper use of everything; and in no instance is this more true than in that of the press," *New York Times*, 376 U.S. at 271, 84 S.Ct. at 721 (quoting 4 Elliott's Debates on the Federal Constitution (1876), p. 571), the Constitution stands as a safe harbor for all but the most malicious political speech.

For the reasons herein stated, the judgment of the district court is

AFFIRMED.