PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-4162

_____

THE HONORABLE LEON A. KENDALL,

                                        Petitioner

v.

THE DAILY NEWS PUBLISHING CO.
d/b/a The Virgin Islands Daily News;
JOY BLACKBURN; and JOSEPH TSIDULKO

_____

On Writ of Certiorari to the Supreme Court
of the Virgin Islands
Supreme Court No. VISC-1: 2010-00046

Argued December 6, 2012

Before: SMITH, HARDIMAN, and ROTH,
*Circuit Judges*

(Filed: March 8, 2013)

Howard M. Cooper
Suzanne M. Elovecky
Julie E. Green         [ARGUED]
Todd & Weld
28 State Street
31st Floor
Boston, MA  02109
    *Counsel for Plaintiff-Petitioner*

Michael L. Berry
Michael D. Sullivan    [ARGUED]
Levine, Sullivan, Koch & Schulz
1760 Market Street
Suite 1001
Philadelphia, PA  19103

Kevin A. Rames
Suite 3
2111 Company Street
Christiansted, St. Croix, VI  00820
    *Counsel Defendants-Respondents*

————————————————

OPINION

————————————————

SMITH, *Circuit Judge.*

We granted certiorari in this case to decide three questions: (1) whether the Virgin Islands Supreme Court correctly applied independent appellate review for actual-malice determinations in public-figure libel suits, (2) what the appropriate actual-malice standard is in defamation-by-implication cases, and (3) whether the justices should have recused themselves. We conclude that although the Supreme Court misapplied independent appellate review, it correctly held that Leon Kendall—a judge formerly on the Virgin Islands Superior Court—cannot establish actual malice for his libel claim. This conclusion means that we need not decide the recusal question because our plenary review makes any potential error from the alleged bias harmless. Accordingly, we will affirm the Court's judgment.

I

A.    Factual History

Judge Kendall contends that the Daily News and Joy Blackburn ("the defendants" or "Daily News") defamed him while reporting on three events in his judicial career: his decision to grant bail to Daniel Castillo, his decision to place Ashley Williams under house arrest, and his decision to retire. Most of the Daily News's articles admitted into evidence discussed the bail decision. Castillo appeared before Judge Kendall in

3

March of 2007 for a preliminary hearing for a charge of aggravated assault. The Government requested that bail be set at $500 because he had previous encounters with the criminal justice system: a 2003 felony conviction for possession of stolen property and a 2004 rape charge that (according to the Government) had been dismissed. Castillo's criminal record contained the 2003 conviction but stated that the rape charge had "no known disp[osition]." In actuality, the rape charge had been one of nine charges which were dismissed when Castillo entered a plea agreement for assault with a deadly weapon. These charges and the assault conviction were absent from the criminal record presented to Judge Kendall. Thus, nothing presented at the hearing indicated that Castillo had a history of violence.

Judge Kendall released Castillo on his own recognizance. On April 6, 2007, Castillo murdered a twelve-year-old girl. Coverage of the murder in the April 14, 2007 edition of the Daily News explained that Castillo was free on his own recognizance on the aggravated assault charges when he committed the murder. After recounting the alleged facts of the assault, the Daily News described the preliminary hearing: "Kendall found probable cause to charge Castillo [with assault] but released him pending trial—despite Castillo's history of violence including charges of rape, assault and weapons violations." Judge Kendall contends this statement and similar statements in subsequent

4

articles were defamatory because they implied that he was aware of Castillo's violent history when, in fact, he was not.

The second set of articles at issue covers Judge Kendall's decision to place Ashley Williams under house arrest. On November 17, 2006, a jury convicted Williams of first-degree rape, first-degree assault, and first-degree unlawful sexual contact. After receiving the verdict, the Government sought to have Williams remanded into custody. Williams, however, requested that he be free over the weekend to get his affairs in order before reporting to prison. Judge Kendall granted Williams's request but placed him under house arrest.

Williams failed to report to jail the following Monday as required by Judge Kendall's order. Instead, Williams refused to leave his home and threatened to blow himself up during a five-hour standoff with police. In a November 21, 2006 article, the Daily News reported on the standoff and explained that Williams was at his home because after he was "convicted of rape and assault," he was "allowed by a judge to spend the weekend in the community unsupervised before he was supposed to report to jail Monday." The article further explained that Judge Kendall had released Williams and that "[t]ypically, people convicted of violent crimes . . . are remanded into custody to await sentencing once they are found guilty." Judge Kendall contends that the Daily

5

News defamed him by stating that Williams was "unsupervised" in the community when, in fact, Williams was under house arrest at the time of the standoff with police.

The final event at issue was Judge Kendall's decision to retire. In a February 19, 2009 article, the Daily News reported on that decision in an article subtitled "[t]hree judicial complaints against him still pending." This subtitle referred to three complaints filed against Judge Kendall with the Virgin Islands Commission on Judicial Disabilities for allegedly misapplying the law in his bail decisions. At the time the article was published, Judge Kendall had successfully challenged the authority of the Commission to hold hearings regarding the complaints in the District Court of the Virgin Islands. This ruling, however, was still on appeal to this Court. Judge Kendall argues that the Daily News defamed him by stating that the complaints were "still pending," even though they had been dismissed by the District Court.

B.      Procedural History

On October 5, 2007, Judge Kendall filed this libel action against the Daily News and two of its reporters, Joy Blackburn and Joseph Tsidulko, in the Virgin Islands Superior Court. After Judge Kendall amended his original complaint to include the retirement article and the parties completed discovery, the case proceeded to a

jury trial. The jury returned a verdict in favor of Judge Kendall for $240,000, and against the Daily News and Blackburn. The jury determined that Tsidulko was not liable. The Daily News and Blackburn subsequently moved for a judgment notwithstanding the verdict. The Superior Court granted this motion and entered a directed verdict in their favor.

Judge Kendall appealed the Superior Court's judgment to the Virgin Islands Supreme Court. Judge Kendall requested that the justices recuse themselves because they had initiated a criminal contempt charge pending against him.[1] The Supreme Court denied his request and affirmed the Superior Court's judgment on the narrow ground that Judge Kendall could not prove actual malice for any of the statements. We subsequently granted certiorari to answer three questions:

> (1) whether the 'actual malice' standard articulated in *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964), can be satisfied by a defendant's mere awareness of a defamatory implication (as opposed to an

---

[1] The criminal contempt charge against Judge Kendall is the subject of a separate proceeding before this panel that is still pending and was argued on December 6, 2012. *See In re Kendall*, No. 11-4471 (3d Cir. argued Dec. 6, 2012).

actual intent to convey that implication) and, if so, whether the standard was satisfied in this case;

(2) whether the Virgin Islands Supreme Court's review exceeded the scope of the "independent examination" required by *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984); and

(3) whether the Virgin Islands Supreme Court Justices erred in not recusing themselves from this matter.

We exercise plenary review over decisions of the Virgin Islands Supreme Court that relate to questions of federal constitutional law. *See People of the V.I. v. John*, 654 F.3d 412, 415, 417–22 (3d Cir. 2011); *Pichardo v. V.I. Comm'r of Labor*, 613 F.3d 87, 98 (3d Cir. 2010).

II

Before turning to the merits, we must first examine whether Congress has removed our jurisdiction over this case with recent legislation that changes how decisions of the Virgin Islands Supreme Court are reviewed by federal courts. *See In re Flat Glass Antitrust Litig.*, 288 F.3d 83, 88 n.5 (3d Cir. 2002) (noting that "we have an 'independent responsibility to examine our own

8

jurisdiction sua sponte'" (quoting *In re Ford Motor Co.*, 110 F.3d 954, 958–59 (3d Cir. 1997))).

In the Revised Organic Act of 1954, as amended in 1984, Congress authorized the Virgin Islands legislature to establish its own local appellate court and provided that when it did so, we would exercise certiorari jurisdiction over that court's final decisions for a limited period of institutional development. *See Defoe v. Phillip*, 702 F.3d 735, 738–40 (3d Cir. 2012) (laying out the history of our relationship with the courts of the Virgin Islands). Our certiorari jurisdiction was to last up to fifteen years from the creation of the Virgin Islands Supreme Court—enough time for the Virgin Islands Supreme Court to develop "sufficient institutional traditions [of its own] to justify direct review by the Supreme Court of the United States." 48 U.S.C. § 1613. Recognizing that the Virgin Islands Supreme Court might develop sufficient institutional traditions before the fifteen-year mark, however, Congress required this Court to regularly evaluate and report on its progress. *Id*.; *see also Defoe*, 702 F.3d at 739–40. The Virgin Islands Supreme Court passed that test with flying colors last year when a committee of this Court recommended to the Third Circuit Judicial Council that Congress eliminate our certiorari jurisdiction over Virgin Islands Supreme Court decisions in favor of direct review by the United States Supreme Court. *See* Judicial Council of the U.S. Court of Appeals for the Third Circuit, *Report on the*

9

*Virgin Islands Supreme Court* 1 (2012), *available at* http://www.visupremecourt.org/wfData/files/ BookletReportofVirginIslandsSupremeCourt.pdf.

Congress agreed and quickly acted on the Third Circuit's recommendation. By December 13, 2012, both the House of Representatives and the Senate had passed H.R. 6116, a bill that would eliminate our certiorari jurisdiction over final decisions of the Virgin Islands Supreme Court and replace it with direct review by the Supreme Court of the United States. *See* An Act to amend the Revised Organic Act of the Virgin Islands to provide for direct review by the United States Supreme Court of decisions of the Virgin Islands Supreme Court, H.R. 6116, §§ 1–2, 112th Cong. (2012). President Obama signed H.R. 6116 into law on December 28, 2012.

We must now decide whether H.R. 6116 strips us of our certiorari jurisdiction over cases like this one in which certiorari has been granted and the matter is awaiting decision at the time of the bill's enactment. We hold that it does not.

When interpreting a statute, we normally presume that the statute does not apply retroactively—that is, to cases pending on the date of the law's enactment—absent clear congressional intent to the contrary. *Hamdan v. Rumsfeld*, 548 U.S. 557, 576 (2006) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). This presumption against retroactivity, however, does not

apply to statutes that only alter jurisdiction. "[U]nlike other intervening changes in the law, a jurisdiction-conferring or jurisdiction-stripping statute usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Id.* at 576–77 (quoting *Hallowell v. Commons*, 239 U.S. 506, 508 (1916)). Consequently, as the Supreme Court has explained, "no retroactivity problem arises" with respect to an intervening change in jurisdiction "because the change in the law does not 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Id.* at 577 (quoting *Landgraf*, 511 U.S. at 280).

"That does not mean, however, that all jurisdiction-stripping provisions . . . must apply to cases pending at the time of their enactment." *Id.* After all, "'[n]ormal rules of [statutory] construction' . . . may dictate otherwise." *Id.* (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). Here, Congress spoke clearly: "[t]he amendments made by [H.R. 6116]"—that is, the elimination of the Third Circuit's certiorari jurisdiction and substitution of such review by the United States Supreme Court—"apply to cases commenced on or after the date of the enactment of [H.R. 6116]." H.R. 6116 § 3. No matter whether "cases commenced" carries a broader meaning referring to the filing of a complaint in the Superior Court or a narrower meaning referring to the

11

filing of a certiorari petition in this Court—an issue we need not decide today—Kendall commenced this case long before H.R. 6116's enactment.

We are mindful that the Ninth Circuit reached the opposite conclusion about Congress's elimination of its certiorari jurisdiction over the Guam Supreme Court's decisions. *See Santos v. Guam*, 436 F.3d 1051, 1054 (9th Cir. 2006). There, the Ninth Circuit concluded that Congress's elimination of its certiorari jurisdiction (and substitution of direct review by the Supreme Court of the United States) did apply to pending cases.

But *Santos* is distinguishable for at least two reasons. To the extent that *Santos* interprets Supreme Court precedent as holding that jurisdiction-stripping provisions automatically apply retroactively absent an express reservation of jurisdiction over pending cases, the Supreme Court subsequently rejected such an approach in *Hamdan*. *See Hamdan*, 548 U.S. at 584 (rejecting this "inflexible" rule advanced by Justice Scalia's dissent and by the Government). More importantly, the jurisdiction-stripping provision in *Santos* differs markedly from the one we confront here. In *Santos*, the Ninth Circuit addressed a statute in which Congress was completely silent about the effective date of the jurisdiction-stripping provision. *Santos*, 436 F.3d at 1053 (explaining that Congress did not "express[] an intent as to the effective date"). By contrast, Congress

12

was explicit that H.R. 6116's amendments apply only "to cases commenced on or after the date of the enactment" of the statute. *See* H.R. 6116 § 3. As a result, we retain certiorari jurisdiction over all cases "commenced" before the President signed H.R. 6116, including this one. *See Hamdan*, 548 U.S. at 584 (drawing the negative inference that Congress did not intend to eliminate jurisdiction over pending detainee habeas petitions where the statute was silent about whether its jurisdiction-stripping subsection applied to cases even though it expressly made two other subsections retroactive).

## III

### A.    Independent Appellate Review

The parties disagree whether the Virgin Island Supreme Court correctly applied the independent-appellate-review standard applied to determinations of actual malice. *See Bose Corp.*, 466 U.S. at 509–11. Independent appellate review is a two-step process. The reviewing court first determines what credibility determinations the jury must have made. This is done by discarding the evidence or testimony that the "jury *must* have rejected" on the basis of "the trial court's instructions, the jury's answers to . . . special interrogatories, and an understanding of those facts not in dispute." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 690 (1989). These "credibility

determinations are reviewed under the clearly-erroneous standard." *Id*. at 688.

The evidence which is not excluded by the *Harte-Hanks* test is then weighed "alongside the undisputed evidence" to determine if the defendant acted with actual malice. *Id*. at 690–91. In other words, as the Ninth Circuit explained in *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997), "we must figure out, as best we can from the cold record, which evidence the jury accepted as credible, and which it discarded. Then we must determine whether the *believed* evidence establishes actual malice." *Id*. at 1252.

The Virgin Islands Supreme Court did not apply this standard in its review. At no point did the Supreme Court analyze what credibility determinations the jury must have made, nor did it express the need to defer to the credibility determinations of the jury. As seen in the two-step process described, however, "[i]ndependent review is not a limitless ransacking of the record as a whole. . . . Purely factual determinations (such as credibility calls) remain subject to the usual degree of deference." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 208 (1st Cir. 2006). The Virgin Islands Supreme Court thus erred by not determining whether the jury made any credibility determinations to which it had to accord deference.

14

B.     Actual Malice

The Virgin Islands Supreme Court's misapplication of independent appellate review is reversible error only if we were to reach a different result by applying the standard appropriately. *See Harte-Hanks*, 491 U.S. at 689–93 (affirming a circuit court holding even though that court had misapplied the independent-appellate-review standard). The Virgin Islands Supreme Court concluded that the evidence was insufficiently clear and convincing to support a jury finding of actual malice. Before we can decide whether that conclusion is correct, we must resolve a dispute between the parties regarding what constitutes actual malice in defamation-by-implication cases.[2]

In defamation-by-implication cases, the alleged

---

[2] The Daily News contends that Judge Kendall has waived this argument because he did not argue that the Superior Court applied the wrong standard before the Virgin Islands Supreme Court. We disagree because the Superior Court used the actual-malice standard urged by Judge Kendall. The possibility that actual malice requires something different in defamation-by-implication cases was first recognized and used by the Virgin Islands Supreme Court, which means Judge Kendall is free to argue that this is a new error perpetrated by the Supreme Court.

15

defamatory statement has two possible meanings, one that is defamatory and one that is not. *See* 50 Am. Jur. 2d Libel and Slander § 158 (explaining that "'[d]efamation by implication' occurs when a defendant juxtaposes a series of facts to imply a defamatory connection between them"). These cases differ from ordinary defamation cases in which the alleged defamatory statement has only a defamatory meaning. *See id*. § 118 (collecting manners in which a statement can be defamatory); *see also* Restatement (Second) of Torts § 559 (explaining that "[a] communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him") (1977). In ordinary defamation cases, the actual-malice standard is relatively clear and undisputed by the parties. "The Supreme Court has defined actual malice as knowledge that a statement was false or [made with] reckless disregard of whether it was false or not." *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1089 (3d Cir. 1988) (quoting *Sullivan*, 376 U.S. at 280) (quotation marks omitted). Recklessness is shown by demonstrating that "the defendant in fact entertained serious doubts as to the truth of the statement or that the defendant had a subjective awareness of probable falsity." *Id*. (internal citations and quotation marks omitted). "[This] standard is a subjective one, based on the defendant's actual state of mind . . . ." *Id*. (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

16

The parties disagree, however, on what constitutes actual malice in defamation-by-implication cases. They agree that there are two elements to actual malice in these cases: a "falsity" element and a "communicative intent" element. The parties also agree as to what satisfies the falsity element—that is, the extent to which defendants must be aware that the defamatory meaning of their statement is false. For this element, the parties concur that plaintiffs must show that the defendants either knew that the defamatory meaning of their statement was false or were reckless in regard to the defamatory meaning's falsity.

They disagree, however, over what is sufficient to satisfy the communicative-intent element—that is, the extent to which defendants must be aware of the defamatory meaning of their statement. The Daily News argues that plaintiffs can satisfy this element only by showing that the defendants intended the defamatory meaning. Judge Kendall agrees that intentional communication of the defamatory meaning is sufficient but argues that plaintiffs can also satisfy this element by showing that the defendants were aware of the defamatory meaning and acted recklessly in regard to it.

Resolving this disagreement requires us to answer two questions: (1) Does the actual-malice standard apply differently in defamation-by-implication cases than in ordinary defamation cases such that more than

17

knowledge of falsity or reckless disregard for truth is required (as the parties believe)? (2) If the standard is different, then is actual malice established, on one hand, only by showing that the defendant intended to communicate the defamatory meaning or, on the other hand, by showing either that the defendant intended to communicate the defamatory meaning *or* was aware of the defamatory meaning and reckless in regard to it?

We agree with the First, Sixth, Seventh, and Ninth Circuits: plaintiffs in defamation-by-implication cases must show something beyond knowledge of, or recklessness in regard to, the *falsity* of the statement's defamatory meaning. *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528–29 (6th Cir. 2007); *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002); *Newton v. Nat'l Broad. Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990); *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1317–18 (7th Cir. 1988). The Supreme Court has explained that in the libel context, "[m]alice [has been] defined in numerous ways, but in general depend[s] upon a showing that the defendant acted with improper motive." *Herbert v. Lando*, 441 U.S. 153, 163–64 (1979). Showing motive "hinge[s] upon the intent or purpose with which the publication was made." *Id*. at 164. These statements show that the intent of the publisher is linked to determining if that publisher had the actual malice necessary to support a libel claim. *Cf. Harte-Hanks*, 491 U.S. at 688 (explaining that actual

18

malice involves a subjective inquiry into a defendant's mental state rather than just an objective determination of a statement's truth); *Saenz*, 841 F.2d at 1317 ("Proof of actual malice depends upon the defendant's actual state of mind." (citing *Herbert*, 441 U.S. at 160)).

The need to show intent necessarily means that the actual-malice standard will have different elements of proof in ordinary defamation cases than in defamation-by-implication cases. In ordinary defamation cases, intent to defame can be established solely through knowledge that the statement was false. After all, if the defendants knew that the statement made was false and defamatory, then they must have intended to defame. And while the statement itself rarely indicates whether its publisher knew it was false, the statement does show that its publisher knew it was defamatory because it can have only defamatory meanings. So all a plaintiff needs to demonstrate in ordinary defamation cases to establish intent to defame is that the defendants knew their statement was false.

But in defamation-by-implication cases, showing known falsity alone is inadequate to establish an intent to defame. In these cases, we may no longer presume with certainty that the defendants knew they were making a defamatory statement because the statement has defamatory and nondefamatory meanings. Therefore, in such cases, plaintiffs must show something that

19

establishes defendants' intent to communicate the defamatory meaning.

This second element of actual malice—showing the defendant's communicative intent—can be satisfied, as Judge Kendall argues, by demonstrating that the defendant either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it. This approach necessarily follows from the Supreme Court's inclusion of recklessness in the actual-malice standard. *Sullivan*, 376 U.S. at 280. Actual malice is a term of art that the Court has explained "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will"; it should be understood to be "a shorthand [used] to describe the First Amendment protections for speech injurious to reputation." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510–11 (1991). Recklessness has always been included in the definition of actual malice under the First Amendment. *See, e.g.*, *Sullivan*, 376 U.S. at 280 (defining actual malice as speaking "with knowledge that it was false or with reckless disregard of whether it was false or not"); *Masson*, 501 U.S. at 510 (restating *Sullivan*'s definition of actual malice). The Court has even described reckless disregard as "the line which our cases have drawn between false communications which are protected and those which are not" that represents the appropriate balancing of the interests at stake in First Amendment

20

cases. *St. Amant*, 390 U.S. at 731–32. Recklessness is thus the outer limit of actual malice, which means that the communicative-intent element of actual malice in defamation-by-implication cases can be satisfied by reckless disregard for the defamatory meaning of a statement.

This approach is supported by the First, Sixth, and Seventh Circuits. These courts have stated that to find actual malice in defamation-by-implication cases, the plaintiff must "show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." *Saenz*, 841 F.2d at 1317–18; *see Compuware Corp.*, 499 F.3d at 528–29; *Howard*, 294 F.3d at 252. This formulation of the rule was first stated by the Seventh Circuit in *Saenz*, which the First and Sixth Circuits subsequently quoted without elaboration. *See Howard*, 294 F.3d at 252; *Compuware Corp.*, 499 F.3d at 528–29. Admittedly, this statement of the actual-malice standard uses the phrase "knew of the implications" rather than "recklessness." The *Saenz* Court, however, treated the phrase "knew of" and the word "recklessness" as synonymous, which is evident in its rearticulation of the standard as requiring the plaintiff to establish "that the defendants intended to imply or were reckless toward the [defamatory] implications." *Saenz*, 841 F.2d at 1318. The actual-malice standard we

21

adopt is thus the same as that articulated by the Seventh Circuit and later adopted by the First and Sixth Circuits.

We emphasize the recklessness conception of this test rather than the "know of" conception because recklessness conforms more closely with the Supreme Court's definition of actual malice. Furthermore, mere knowledge of the defamatory meaning of a statement that also has a nondefamatory meaning cannot be enough. The Supreme Court's balancing of the First Amendment interests in public-affairs libel suits favors permitting some libelous conduct to avoid chilling protected speech. *See St. Amant*, 390 U.S. at 731–32 (explaining that the recklessness standard is preferable to a reasonable-man standard because "protect[ing] some erroneous publications as well as true ones" is necessary "to insure the ascertainment and publication of the truth about public affairs"). Yet if mere knowledge were sufficient to find defamatory intent, then actual malice could be found no matter how unlikely it is that a listener would interpret the statement as having the defamatory meaning. This is contrary to the Supreme Court's preference for a broader scope of protection for potentially libelous speech. Recklessness, by contrast, captures this preference because it requires that the defendants knew that the defamatory meaning was not just possible, but likely, and still made the statement despite their knowledge of that likelihood. *Cf. Harte-Hanks*, 491 U.S. at 688 (defining reckless disregard for the truth as instances where "the

22

defendant actually had a high degree of awareness of probable falsity").

The defendants rely on the Ninth Circuit's *Newton* decision,[3] which does not include reckless disregard for, or knowledge of, the defamatory meaning in its articulation of the communicative-intent element. 930 F.2d at 681 (explaining that libel liability cannot be permitted for "what was not intended to be said"). The *Newton* Court did not consider, much less reject, whether the communicative-intent element may be satisfied by showing a reckless disregard for the defamatory meaning of a statement. *See* 930 F.2d at 681. The decision thus does not necessarily conflict with the standard we now adopt. *See Howard*, 294 F.3d at 254 (treating the Ninth Circuit's *Newton* decision as compatible with the Seventh Circuit's *Saenz* decision). Moreover, to the extent the Ninth Circuit's usage provides any persuasive value to the defendants' argument, that value is outweighed by the

---

[3] The defendants cite several additional cases to support their argument. These decisions, however, do not discuss the actual-malice standard. Instead, they analyze what needs to be shown to satisfy the state-law elements of libel in defamation-by-implication cases. *See Nichols v. Moore*, 477 F.3d 396, 402 (6th Cir. 2007); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993); *White v. Fraternal Order of Police*, 909 F.2d 512, 518–19 (D.C. Cir. 1990).

23

inclusion of recklessness in the Supreme Court's definition of actual malice.

IV

We next consider whether the Virgin Islands Supreme Court erred by ruling that Judge Kendall cannot establish actual malice. We will reverse the Supreme Court only if our independent review of the record shows that a jury could find actual malice by clear-and-convincing evidence. *Tucker v. Fischbein*, 237 F.3d 275, 284 (3d Cir. 2001). This standard "requires the [plaintiff] to provide evidence so clear, direct, weighty, and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted" in a way that renders them liable. *See Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011) (citation and internal quotation marks omitted). Judge Kendall contends that the Virgin Islands Supreme Court erred by holding that the evidence is insufficient to find actual malice for statements made in the articles relating to his release of Castillo on his own recognizance, his decision to place Williams under house arrest, and his decision to retire. We agree with the Supreme Court's ruling in its entirety and will thus affirm.

A.    Castillo Articles

Judge Kendall argues that the defendants' articles relating to his bail decision in Daniel Castillo's case are

24

defamatory because they implied that he knew of Castillo's history of violence when he released Castillo on his own recognizance. The defendants' articles contained the statement (or statements similar to): "Kendall found probable cause to charge Castillo but released him pending trial—despite Castillo's history of violence including charges of rape, assault and weapons violations." Although this statement does not explicitly say that Judge Kendall released Castillo despite *knowing* of his history of violence, Judge Kendall contends that this is the implication the defendants intended readers to understand. As we have explained, to show actual malice for defamation by implication, Judge Kendall must show by clear-and-convincing evidence both (1) that the defendants either intended the defamatory meaning or knew of the defamatory meaning and were reckless in regard to it, and (2) that the defendants made the statement with "knowledge that [the] statement was false or [with] reckless disregard of whether it was false or not," *Schiavone Constr. Co.*, 847 F.2d at 1089 (quoting *Sullivan*, 376 U.S. at 280) (quotation marks omitted).

Judge Kendall first argues that we must disregard the testimony of Blackburn, who authored the articles, because the jury must have found her testimony incredible. *See Harte-Hanks*, 491 U.S. at 690. We agree. Blackburn testified that when she wrote the statement, she intended a nondefamatory meaning that "Mr. Castillo had a history of violence and Judge Kendall did choose

25

to release him." The jury must have concluded that this testimony was incredible because to decide otherwise—that Blackburn did not intend the defamatory meaning—would have prevented them from finding actual malice, as they did. We thus cannot consider Blackburn's testimony about the meaning of her statement.

The jury's rejection of her testimony does not end our analysis, however. Mere disbelief of a defendant's statement ordinarily is insufficient to establish malice. *Bose*, 466 U.S. at 512 ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."). Judge Kendall argues that the communicative-intent element of actual malice is satisfied through Blackburn's coverage of protests that followed Castillo's murder of a 12-year-old girl. Judge Kendall contends that even if the defendants were initially unaware that their statement could imply that he was aware of Castillo's history of violence when he released him on his own recognizance, they were made aware through the protests organized by people who, as Blackburn acknowledged at trial, "understood that Judge Kendall had released Mr. Castillo despite his history of violence." Once the defendants were aware of what the public understood their statement to mean, he argues, their continued publication of the statement was at least reckless.

26

This evidence is insufficient to satisfy the communicative-intent element by clear-and-convincing evidence in light of the subjective nature of the actual-malice inquiry. *Schiavone Constr. Co.*, 847 F.2d at 1089 (quoting *St. Amant*, 390 U.S. at 731). The subjective nature of this inquiry requires that there be some evidence showing, directly or circumstantially, that the defendants themselves understood the potential defamatory meaning of their statement. *Id.* (quoting *St. Amant*, 390 U.S. at 731). No direct evidence in the record of this case suggests that the defendants themselves knew of, much less intended, the defamatory meaning.

There is also no circumstantial evidence of record linking the protestors' understanding of what took place with the statement made by the defendants. The protestors' testimony did not establish that the Daily News was their source. The protesters could not recall at trial whether their source was the statements by the Daily News or coverage from other Virgin Islands news outlets. If the Daily News's reporting had been the sole source of information for Castillo's case, then Judge Kendall would have a stronger basis for inferring the defendants' knowledge of and recklessness with regard to the defamatory meaning of the statement. But here, the story was covered by several news outlets, which makes it impossible to know whether the protests were caused or informed by the defendants' statements. Consequently, we cannot conclude with "clear conviction" and "without

27

hesitation" that the defendants were made aware of the defamatory meaning of their statement through their coverage of the protests. *Amica Mut. Ins. Co.*, 656 F.3d at 179 (explaining what satisfies the clear-and-convincing standard). Because Judge Kendall cannot establish that the defendants intended the defamatory meaning or knew of it and were reckless in regard to it, he fails to prove actual malice by clear-and-convincing evidence.[4]

B.      Williams Articles

Judge Kendall next argues that the Daily News's articles regarding Ashley Williams are defamatory because they stated that Judge Kendall allowed Williams "to spend the weekend in the community unsupervised." In fact, Judge Kendall had placed him under house arrest. This is an ordinary defamatory statement rather than one by implication, so to establish actual malice, Judge Kendall must show that the statement was made with "knowledge that [the] statement was false or [with] reckless disregard of whether it was false or not."

---

[4] Because Judge Kendall needs to show both elements of actual malice to succeed, and we conclude that he cannot satisfy the communicative-intent elements, we need not address whether he can prove that the defendants knew of or recklessly disregarded the Castillo articles' falsity.

28

*Schiavone Constr. Co.*, 847 F.2d at 1089 (quoting *Sullivan*, 376 U.S. at 280) (quotation marks omitted).

There is no evidence that the defendants knew their statement was false. Blackburn, who authored this article, was not informed that the statement was incorrect until litigation commenced. Judge Kendall argues, however, that Blackburn's testimony demonstrates actual malice through recklessness. He contends that the jury must have determined from her testimony that she fabricated her "unsupervised" description because she did not have a source for the assertion. Fabrication may constitute recklessness, *St. Amant*, 390 U.S. at 732, but the jury did not necessarily conclude that she was without a source for her article. The relevant testimony is:

> Q: You didn't tell [the public] that [Williams] had been placed under house arrest with arrangements to be made by the Marshals, right?
>
> A: No one there that night, none of those officers who were there, not a single one of them were saying, oh, Mr. Williams is under house arrest.
>
> Q: Did you ask that question?
>
> A: No, sir.

29

. . .

Q: Miss Blackburn, did you walk over to any of those people, those law enforcement people, and say, could you tell me what's going on here? What are the circumstances of Mr. Williams being in his home?

You had already written your story two days earlier. You knew he had been convicted.

A: Yeah, I knew he had been convicted. And –

Q: So, didn't you think it was important, before you told the community that Judge Kendall had just let him out unsupervised in the community, to be accurate and truthful?

A: Nobody who was there was saying the man is supervised.

. . .

Q: Now, you claimed, as I understand it, that the source for the words that you used "released unsupervised in the community" was Assistant Attorney General Renee Gumbs Carty who said those words to you on a telephone call in which another Assistant Attorney General name[d] Kerry

30

Drue supposedly was listening in. Is that your testimony?

A: . . . Yes, sir.

Q: And I just want to be very clear for the jury.

Your testimony under oath is that Renee Gumbs Carty said to you in a telephone call in which Attorney General Kerry Drue . . . was on the phone as well, that Judge Kendall had released Mr. Williams for the weekend unsupervised in the community. Is that your testimony?

A: My recollection is that they send [sic] him home for the—that they said that the Judge—at the request of the defense that the Judge sent Mr. Williams home for the weekend to get his affairs in order.

Q: Did they tell you that Judge Kendall had released Mr. Williams for the weekend unsupervised in the community; yes or no.

A: I told you what my recollection of what they said to me was.

Q: So they didn't tell you that.

31

A: They said at the request of the defense, again, that Judge Kendall allowed him to go home for the weekend to get his affairs in order.

Q: Did they use the word "unsupervised"—words "unsupervised in the community," Miss Blackburn? Yes or no.

A: I don't recall them using the word "unsupervised."

The only conclusion the jury must have drawn from this testimony is that none of the officers at the standoff and none of the prosecutors Blackburn spoke with told her that Williams was released into the community "unsupervised." This is a necessary conclusion because if the jury believed that the officers or the prosecutors did tell her this, then there would be direct evidence that Blackburn believed that Williams was, in fact, unsupervised.

Importantly, the jury did not necessarily conclude that Blackburn lacked a source for her story. To reach that conclusion, the jury would have needed to make the inferential conclusions that being sent "home" is different from being "unsupervised" and that the officers' lack of discussion of supervision was irrelevant to whether Blackburn had a source. Although these are reasonable inferences, they are not ones we need to defer to under

32

independent review if our review of the evidence brings us to a contrary conclusion. *See Harte-Hanks*, 491 U.S. at 690; *Newton*, 930 F.2d at 670–71 (explaining that in the independent-appellate-review context, the "presumption of correctness" of jury determinations "applies with less force when a factfinder's findings rely on its weighing of evidence and drawing inferences").

The evidence does not support the conclusion that Blackburn fabricated her story. The parties agree that she was at the scene of Williams's standoff, and her testimony shows that the officers did not tell her that Williams was under house arrest. Furthermore, the prosecutors explained that Judge Kendall sent Williams "home."[5] Finally, there is no evidence that Blackburn had any information that Williams was under house arrest. *Cf. Schiavone Constr.*, 847 F.2d at 1090 (explaining that recklessness can be found where "the defendant finds internal inconsistencies or apparently reliable information that contradicts [the defendant's] libelous assertions, but nevertheless publishes those statements anyway"). Blackburn's conclusion that Williams was unsupervised is thus reasonably derived from her observations at the

---

[5] We may consider Blackburn's testimony regarding what the officers and prosecutors told her because the jury did not necessarily reject it. They likely gave it little weight, but their weighing of the evidence is accorded little deference under our standard of review.

33

scene and her knowledge that he was sent "home." Although she could have done more to verify the facts of her story, the information she had assembled shows that her conclusion was not fabricated. Actual malice thus cannot be established on the basis that the defendants fabricated the story.

Judge Kendall's alternative basis for actual malice is that Blackburn should have done more to verify the facts of her Williams article. She was at least reckless regarding her story's falsity, he argues, because she never sought the transcript of the hearing in which Judge Kendall imposed house arrest. This cannot serve as a basis for finding actual malice, however, because "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard" absent some evidence showing that the defendant seriously doubted the truth of the statement. *Harte-Hanks*, 491 U.S. at 688. The lack of evidence showing any doubt, coupled with the determination that the story was not fabricated, means that there is insufficient evidence that the defendants acted with actual malice.

C.    Retirement Article

Finally, Judge Kendall argues that the Daily News's article regarding his retirement is defamatory because the subtitle stated that there were "[t]hree

34

judicial conduct complaints against him still pending."[6] This statement is false, he contends, because the complaints had been dismissed by the District Court of the Virgin Islands (though the District Court's ruling was still pending on appeal).[7] This is an ordinary defamatory statement, so to establish actual malice, Judge Kendall must show that the statement was made with "knowledge that [the] statement was false or [with] reckless disregard of whether it was false or not." *Schiavone Constr. Co.*, 847 F.2d at 1089 (quoting *Sullivan*, 376 U.S. at 280) (quotation marks omitted).

---

[6] The defendants contend that this argument is not within our grant of certiorari for "whether the Virgin Islands Supreme Court's review exceeded the scope of the 'independent examination' required in *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)." Judge Kendall's argument is within the scope of our grant of certiorari because he contends that the Virgin Islands Supreme Court should have deferred to the jury with regard to the testimony of the subtitle's author, J. Lowe Davis, which Judge Kendall believes was adequate to establish actual malice.

[7] We assume that the alleged defamatory statement is false because our writ of certiorari is limited to the Virgin Islands Supreme Court's application of independent appellate review to its actual-malice analysis.

35

Judge Kendall argues that the evidence is sufficient in light of the credibility determination that the jury supposedly made regarding the testimony of the subtitle's author. The author testified that "[a]t the time [she] wrote the headline of the aforementioned article, [she] believe[d] that it was entirely accurate and did not state or imply any fact that [she] knew to be false or about which [she] entertained any serious doubt." Judge Kendall argues that the jury's finding of actual malice means that the jury disbelieved the author's testimony *and* that the article itself did not state that the complaints were still pending. The jury likely made these conclusions, but we defer only to the jury's finding that the author's testimony was incredible. *See Harte-Hanks*, 491 U.S. at 690. We do not defer to the jury's possible conclusion that the article did not support the subtitle because that conclusion requires an inference from the text of the article, which we are free to review independently. *See id*. at 688–89.

In light of the jury's credibility determination and our review of the remaining evidence, actual malice cannot be established by clear-and-convincing evidence. The jury's disbelief of the statement's author is not sufficient because a plaintiff must show more than mere disbelief to establish actual malice. *Bose*, 466 U.S. at 512 ("When testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing

36

a contrary conclusion."). Nothing in the record demonstrates that the defendants knew their statement was false or were reckless in regard to its falsity. The Daily News's description of the complaints in the body of the article itself illustrates that it believed they were still pending. The article describes the complaints in the present tense—"the complaints against Kendall include"—and it accurately reports that Judge Kendall's victory in the District Court was on appeal, suggesting that a final determination of the complaints' fate had not been reached.[8] The absence of any evidence that the

---

[8] The relevant portion of the article states:

> Since May 2007, The Daily News has reported on three separate complaints made to the Commission on Judicial Disabilities against Kendall. These complaints either asked for an investigation into the judge's pattern of conduct from the bench or for his removal.

> The complaints against Kendall include: [Description of the complaints brought separately by Judicial Watch, the Women's Coalition of St. Croix, and a St. Thomas businesswoman.]

> In October 2007, Kendall filed a lawsuit in District Court asking the court to stop the commission from conducting any hearings

37

Daily News thought its description of the complaints as "pending" was or could be false means that there is not clear-and-convincing evidence to support a finding of actual malice.

*  *  *

For these reasons, we will affirm the Virgin Islands Supreme Court's ruling that Judge Kendall cannot establish the actual malice required to support his libel claims. This conclusion means that we need not decide whether the justices of the Supreme Court should have recused themselves. We have explained that "failure to disqualify . . . may be harmless error when a court of

---

on complaints made against him, contending that those hearings would violate the separation of powers doctrine and threaten the independence of the territorial judiciary. In that suit, Kendall contends that he scrupulously follows the federal Bail Reform Act but some other V.I. Judges do not.

In Jan. 2008, Chief District Court Judge Curtis Gomez ruled that the Virgin Islands Commission on Judicial Disabilities has no authority to remove judges. The commission has appealed to the 3rd Circuit Court of Appeals.

appeals will later review a ruling on a plenary basis." *In re Sch. Asbestos Litig.*, 977 F.2d 764, 786 (3d Cir. 1992). Plenary review allows us to find harmlessness because "[a]ny bias which may have infected the district court's decision is fully remedied by our consideration of the motions." *United States v. Vespe*, 868 F.2d 1328, 1342 (3d Cir. 1989); *see also Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 170–72 (3d Cir. 2004).

As explained at the outset, we exercised plenary review over the Virgin Islands Supreme Court's conclusion that Kendall cannot show actual malice because it is a matter of constitutional law. *See John*, 654 F.3d at 415, 417–22; *Pichardo*, 613 F.3d at 98. Any possible harm that may have been done by the Supreme Court justices' decision to not recuse themselves (and we do not suggest that any harm occurred) is thus eliminated by our own review. Our application of independent appellate review does not change this analysis. That standard only requires deference to jury determinations at the trial court, and Judge Kendall does not challenge the impartiality of either the trial judge or the jury verdict.

39